IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

JACQUELINE OLIVERA,

          Plaintiff,

   v.

BAXTER HEALTHCARE CORP.,

          Defendant.

HON. JEROME B. SIMANDLE

Civil No. 06-6115 (JBS)

**OPINION**

APPEARANCES:

William B. Hildebrand, Esq.
LAW OFFICES OF WILLIAM B. HILDEBRAND, LLC
1040 Kings Highway North
Suite 601
Cherry Hill, NJ 08034
    Attorney for Plaintiff

Christopher H. Lowe, Esq.
SEYFARTH SHAW, LLP
620 Eighth Avenue
New York, NY 10018-1405
    Attorney for Defendant

**SIMANDLE**, District Judge:

I.   **INTRODUCTION**

This matter is before the Court on cross motions for summary judgment.  Plaintiff Jacqueline Olivera ("Plaintiff" or "Olivera") moves for partial summary judgment [Docket Item 30], arguing that Defendant Baxter Healthcare Corporation ("Defendant" or "Baxter") is liable for disability discrimination under the New Jersey Law Against Discrimination ("NJLAD") for transferring Plaintiff into a job with decreased compensation on account of

her asthma.  In opposition, Defendant filed a cross motion for summary judgment [Docket Item 37], arguing that it cannot be liable for disability discrimination because Baxter reasonably believed that it would be unsafe for Plaintiff to continue in her position as a filling operator, based on the information about Plaintiff's medical condition that Plaintiff and her doctor communicated to Baxter.

The Court finds that a jury must determine whether Baxter's conclusion was reasonable.  Because a reasonable jury could find that Baxter reasonably concluded that Plaintiff's asthma presented a materially enhanced risk of substantial harm to her in the workplace, and that therefore she could not perform her job as a filling operator, the Court shall deny Plaintiff's motion for summary judgment.  On the other hand, this is an affirmative defense that Baxter must prove at trial and the evidence in the record is equivocal.  A reasonable jury could also find that Baxter did not come to a reasonable conclusion about whether Plaintiff's work presented a materially enhanced risk of substantial harm to her.  Accordingly, the Court must also deny Defendant's motion for summary judgment.

**II.   BACKGROUND**[1]

**A.   Nature of Plaintiff's Employment**

Defendant Baxter Healthcare Corporation is a global medical products and services company that manufactures injectable pharmaceuticals at its facility in Cherry Hill, New Jersey. (Baxter Answer ¶ 2.)  Plaintiff started working at the facility in 1992, for a predecessor company to Baxter.  (Baxter St. Undisp. Mat. Facts ¶ 2; Pl. Resp. ¶ 2.)   She started in packing and over the years worked her way up to become a filling operator.  (Pl. St. Undisp. Mat. Facts ¶ 2; Baxter Resp. ¶ 2.) From December 2002 through May 2006, Olivera worked for Baxter as a filling operator at the Cherry Hill facility.  (Pl. St. Undisp. Mat. Facts ¶ 2; Baxter Resp. ¶ 2.)

Filling operators work in sterilized rooms, filling vials or ampules with injectable pharmaceutical products.  (Pl. St. Undisp. Mat. Facts ¶ 3; Baxter St. Undisp. Facts ¶ 3.)  The sterile filling area is a progression of sanitized corridors where the air classification and sanitization procedures are significantly more stringent as the employee progresses through each corridor.  (Baxter. St. Undisp. Mat. Facts ¶ 5; Pl. Resp. ¶

---

[1]   The facts set forth in this section are those drawn from the record in the case.  The Court does not view them in either party's favor, but rather only summarizes the evidence.  In its analysis of each motion, section **III.C.**, <u>infra</u> at 33, the Court views the record evidence in the light most favorable to the non-moving party.

5.)  The "air lock" is a passageway located near the beginning of the sterile filling area that serves as the dividing line between the non-sterile and sterile areas.  (Baxter. St. Undisp. Mat. Facts ¶ 5; Pl. Resp. ¶ 5.)  The air lock is where the sterile gowns are located for the filling operators to change into. (Baxter. St. Undisp. Mat. Facts ¶ 5; Pl. Resp. ¶ 5.)  The "filling room" is the most sterilized area with the highest air classification and it is where the product is filled.  (Baxter. St. Undisp. Mat. Facts ¶ 5; Pl. Resp. ¶ 5.)

Filling operators fill medicines, complete paperwork, and are required to wear boots, a gown, hood, mask gloves, and special glasses.  (Pl. St. Undisp. Mat. Facts ¶ 3; Baxter Resp. ¶ 3.)  In addition, on a rotating basis the filling operators clean and sanitize the filling equipment as well as the air lock. (Baxter St. Undisp. Mat. Facts ¶¶ 6-7; Pl. Resp. ¶¶ 6-7.) The air lock cleaning function involves cleaning the air lock, the dressing room, the corridor and any other filling rooms that are not in use during that particular day, as well as stocking needed supplies.  (Baxter St. Undisp. Mat. Facts ¶ 7; Pl. Resp. ¶ 7.) The cleaning solution that filling operators use contains bleach, peroxide and alcohol.  (Pl. St. Undisp. Mat. Facts ¶ 7; Baxter Resp. ¶ 7.)  One filling operator is needed to perform the air lock cleaning function per area during the day shift.  (Pl. St. Undisp. Mat. Facts ¶ 6; Baxter Resp. ¶ 6.)  The assigned employee

4

typically performs this task three times during an eight-hour shift and rotates back to his or her filling position.  (Id.) The filling operators who perform the air lock cleaning function do not wear any different protective gear than those operators who are performing the filling function.  (Pl. St. Undisp. Mat. Facts ¶ 8; Baxter Resp. ¶ 8.)  Filling Operators are not permitted to bring any personal items into the filling rooms with them, including any medications or inhalers, because everything that enters the filling rooms must be sterile.  (Baxter St. Undisp. Mat. Facts ¶ 9; Pl. Resp. ¶ 9.)   In addition, filling operators must wipe down with bleach any equipment they bring through the air lock.  (Olivera 1Dep.[2] at 45:5-19, Ex. B to White Cert.; Baxter St. Undisp. Facts ¶ 8; Pl. Resp. ¶ 8.)

**B.   Plaintiff's Asthma**

Plaintiff suffers from asthma, a disease involving the lungs that causes spasm of the bronchial passages and results in a variety of symptoms, including cough, wheezing, shortness of breath, and chest tightness.  (Pl. St. Undisp. Mat. Facts ¶ 9; Baxter. Resp. ¶ 9.)  The severity of the illness varies by individual, ranging from very mild to life-threatening.  (Pl. St. Undisp. Mat. Facts ¶ 10; Baxter. Resp. ¶ 10.)  In general, it is

---

[2] "Olivera 1Dep." refers to the transcript of Plaintiff's deposition on May 25, 2007.  "Olivera 2Dep." refers to the transcript of the second day of Plaintiff's deposition, June 8, 2007.

possible for a person to die from an asthma attack and the condition can be physically disabling. (Id.)  People with asthma have various triggers that initiate their symptoms. (Pl. St. Undisp. Mat. Facts ¶ 11; Baxter. Resp. ¶ 11.)  Allergic reactions and exposure to chemicals or chemical vapors can trigger asthma. (Pl. St. Undisp. Mat. Facts ¶ 11; Baxter. Resp. ¶ 11.)

Dr. Steven Gitler is Plaintiff's family physician. (Pl. St. Undisp. Mat. Facts ¶ 12; Baxter. Resp. ¶ 12.)  He is licensed to practice medicine in Pennsylvania and New Jersey and has been board-certified in family medicine since 1993. (Pl. St. Undisp. Mat. Facts ¶ 12; Baxter. Resp. ¶ 12.)  He is employed in a family practice where he has a couple of thousand patients, more than 100 of whom suffer from asthma. (Pl. St. Undisp. Mat. Facts ¶ 12; Baxter. Resp. ¶ 12.)  Dr. Gitler has treated hundreds of patients with asthma during his career. (Pl. St. Undisp. Mat. Facts ¶ 12; Baxter. Resp. ¶ 12.)

Dr. Gitler first examined Plaintiff in November of 2004. (Pl. St. Undisp. Mat. Facts ¶ 13; Baxter. Resp. ¶ 13.)  During that visit, she told him her medical history, including that she had been previously diagnosed with asthma and was taking Proventil on an "as needed" basis. (Pl. St. Undisp. Mat. Facts ¶ 13; Baxter. Resp. ¶ 13.)  During Plaintiff's first few visits with Dr. Gitler, she did not complain about her asthma or report any asthma-related symptoms and she mentioned that she hadn't

6

used her Proventil inhaler for months.  (Pl. St. Undisp. Mat. Facts ¶ 13; Baxter. Resp. ¶ 13.)  In general, Dr. Gitler considers her asthma to be not severe.  (Pl. St. Undisp. Mat. Facts ¶ 13; Baxter. Resp. ¶ 13.)[3]

### C.   Plaintiff's Asthma in the Workplace

#### 1.   Plaintiff's Reaction to fantastik® in Prior Position

Prior to working for Baxter as a filling operator, Plaintiff's job responsibilities did not normally include cleaning with chemicals.  (Baxter St. Undisp. Mat. Facts ¶ 10; Pl. Resp. ¶ 10.)  Nevertheless, on one occasion in May 2001, while working in a sterilized closed room in the Glass Prep Department, Plaintiff suffered an attack while cleaning the room with fantastik®.[4]  (Baxter St. Undisp. Mat. Facts ¶ 11; Pl. Resp. ¶ 11.)  Plaintiff became short of breath because the area was closed and the fumes affected her.  (Baxter St. Undisp. Mat. Facts ¶ 11; Pl. Resp. ¶ 11.)  Her eyes also became swollen and very red and she developed a rash.  (Baxter St. Undisp. Mat. Facts ¶ 11; Pl. Resp. ¶ 11.)  As a result of this incident with

_____

[3]  Dr. Gitler also testified that it was "possible" that a person with a history of non-severe asthma could have a subsequent severe asthma attack, but Dr. Gitler did not opine whether Ms. Olivera was likely to suffer such a severe attack. (Gitler Dep. at 203.)

[4]  "fantastik®" is a brand name used for a group of cleaning sprays manufactured by S.C. Johnson & Son, Inc., some of which contain bleach.

fantastik®, Plaintiff went to the Emergency Room at Our Lady of Lourdes Medical Center, where doctors diagnosed her with chemical conjunctivitis.[5] (Baxter St. Undisp. Mat. Facts ¶ 12; Pl. Resp. ¶ 12.)

    2.  <u>August 2003 Reaction and Accommodation</u>

From approximately December 2002 through April 2006, Plaintiff worked for Baxter as a filling operator on the first shift, from 5 or 6 a.m. to 1:30 or 2:30 p.m. (Baxter St. Undisp. Mat. Facts ¶ 13; Pl. Resp. ¶ 13.) On or about August 26, 2003, Plaintiff experienced a negative reaction to the cleaning solution while cleaning the air lock at work. (Baxter St. Undisp. Mat. Facts ¶ 14; Pl. Resp. ¶ 14.) Plaintiff was wearing the required gown, goggles, mask, and other sterilized clothing at the time. (Baxter St. Undisp. Mat. Facts ¶ 14; Pl. Resp. ¶ 14.) Medical records indicate that Plaintiff's eyes were burning, watering and swollen. (Baxter St. Undisp. Mat. Facts ¶ 14; Pl. Resp. ¶ 14.) Plaintiff also testified that she was wheezing. (Oliver 1Dep. at 71:23-24, Ex. B to White Cert.) That evening, Plaintiff visited the Emergency Room at Our Lady of Lourdes hospital and informed the physician that she was asthmatic and believed that the fumes from the cleaning solution

---

[5] Chemical conjunctivitis is "conjunctival inflammation due to chemical irritants." <u>Stedman's Medical Dictionary</u> 431 (28th ed. 2006). The conjunctiva is "the mucous membrane investing the anterior surface of the eyeball and the posterior surface of the lids." <u>Id.</u>

caused her reaction.  (Baxter St. Undisp. Mat. Facts ¶ 15; Pl.
Resp. ¶ 15.)  Again Plaintiff was diagnosed with chemical
conjunctivitis.  (Baxter St. Undisp. Mat. Facts ¶ 15; Pl. Resp. ¶
15.)

The following day, Plaintiff was treated by an
ophthalmologist, Dr. Kresloff, who diagnosed her with mild
corneal irritation and prescribed eye drops to be used for three
days.  (Baxter St. Undisp. Mat. Facts ¶ 16; Pl. Resp. ¶ 16.)  She
called out sick for three days and submitted a note from Dr.
Kresloff to Baxter's nurse and spoke to her supervisor, Kenneth
Bay.  (Baxter St. Undisp. Mat. Facts ¶ 18; Pl. Resp. ¶ 18.)  The
note recommended that Plaintiff not be allowed in rooms with
bleach for one week.  (Baxter St. Undisp. Mat. Facts ¶ 17; Pl.
Resp. ¶ 17.)  The note also recommended that Baxter consider
transferring Plaintiff from jobs that use bleach.  (Baxter St.
Undisp. Mat. Facts ¶ 17; Pl. Resp. ¶ 17.)  Anthony Woodruff, the
facility's Environmental Health and Safety Technician, spoke with
Plaintiff and recommended that she be evaluated to determine
whether she was in fact having a reaction to the cleaning
process.  (Baxter St. Undisp. Mat. Facts ¶ 19; Pl. Resp. ¶ 19.)
Baxter followed Dr. Kresloff's advice and assigned other
employees to perform the air lock cleaning function, although
there is a dispute about whether this change was intended to be
temporary.  (Baxter St. Undisp. Mat. Facts ¶ 19; Pl. Resp. ¶ 19;

9

Pl. St. Undisp. Mat. Facts ¶ 14.)

For three years after this incident, Plaintiff was exempt from performing the air lock cleaning function – from September 2003 through April 2006. (Baxter St. Undisp. Mat. Facts ¶ 20; Pl. Resp. ¶ 20.)  Because of this change, Plaintiff experienced no further problems as a result of her exposure to bleach at work and performed her duties as a filling operator well. (Pl. St. Undisp. Mat. Facts ¶ 14; Baxter Resp. ¶ 14.)

Ken Bay was Plaintiff's direct supervisor in September 2003. Woodruff told Bay that Plaintiff's reaction to the cleaning solution may have been tied to her asthma condition.  (Pl. St. Undisp. Mat. Facts ¶ 18; Baxter Resp. ¶ 18.)  Bay testified that he felt Plaintiff could not work as a filling operator after her August 2003 reaction, but he also testified that he thought the Environmental Health and Safety Department had to make that decision.  (Baxter Resp. ¶ 18.)

Baxter admits that the air lock cleaning function is not an essential function of the filling operator position in general, but argues that it is essential that all operators be able to perform even this secondary function on the weekend shifts.  (Pl. St. Undisp. Mat. Facts ¶ 16; Baxter Resp. ¶ 16.)[6] During the week, there are sufficient employees available to perform the

_____

[6]  It is clear, however, that it is essential to the filling operation that someone clean the room and air lock with the sterilizing cleaning solution.

task and Plaintiff's exemption did not interfere with Baxter's operations.  (Pl. St. Undisp. Mat. Facts ¶ 16; Baxter Resp. ¶ 16).  See also (Bohn Dep. at 47:19-23, Ex. H to Hildebrand Cert.) (conceding that air lock sanitation is not an essential function of the filling operator position).[7]  However, Baxter claims that Plaintiff's inability to clean did interfere with its operations on the weekend.  (Baxter Resp. ¶¶ 16, 17).  Thirteen other employees worked with Plaintiff on the day shift during the week.  (Pl. St. Undisp. Mat. Facts ¶ 17; Baxter Resp. ¶ 17.)  As a result of Plaintiff's restriction, the other filling operators performed the air lock sanitation function once every twelve working days instead of once every thirteen working days.  (Pl. St. Undisp. Mat. Facts ¶ 17; Baxter Resp. ¶ 17.)  During the week, there was no other impact on Baxter's operations and Baxter lost no money as a result of this change.  (Pl. St. Undisp. Mat. Facts ¶ 17; Baxter Resp. ¶ 17.)

Plaintiff testified that when she was working as a filling operator she could smell bleach when she passed through the air

---

[7]  It is unclear what the legal significance of that claim is, given that Baxter presents no argument that Plaintiff's need to avoid the cleaning function either created an undue hardship for Baxter or precluded Plaintiff from performing an essential job function, two circumstances that would, if proved, exempt Baxter from accommodating Plaintiff under the NJLAD.  Baxter's sole legal arguments are that (1) it was unsafe for Plaintiff to work as a filling operator, even with her accommodation, and (2) Baxter reasonably determined that it was unsafe for Plaintiff to work as a filling operator.

lock but not when she was in the filling room.  (Pl. St. Undisp. Mat. Facts ¶ 15; Baxter Resp. ¶ 15.)  Plaintiff also testified that she passed through the air lock three to seven times per day.  (Olivera 1Dep. at 121:16 to 122:10, Ex. B to White Cert.)

Dr. Gitler told Plaintiff that the inhalation of bleach and other cleaning fumes were triggers for her asthma.  (Olivera 2Dep. at 13:13-15, 21:13-24, Ex. C to White Cert.)  Plaintiff did not personally clean the floors in the filling rooms or do other cleaning very often at work because it affected her asthma. (Olivera 1Dep. at 46:2-9.)  Plaintiff does not use bleach in her home because she has a negative reaction to the smell of it. (Id. at 159:14-19.)

### 3.   Change in Management and Loss of Overtime

In early 2006, Baxter reorganized its supervisory staff and James Sneller became Plaintiff's supervisor on or about January 9, 2006.  (Pl. St. Undisp. Mat. Facts ¶ 19; Baxter St. Undisp. Mat. Facts ¶ 22.)  Ken Bay told Sneller that Plaintiff was restricted from performing air lock duties and that he should account for this exemption in scheduling filling operator assignments.  (Baxter St. Undisp. Mat. Facts ¶ 22; Pl. Resp. ¶ 22.)  At the time, Sneller was not aware of the reason for Plaintiff's exemption.  (Baxter St. Undisp. Mat. Facts ¶ 22; Pl. Resp. ¶ 22.)

Also in early 2006, Sneller had a discussion with Bohn, the

Human Resources Manager; Scott Overbeck, the Manufacturing
Manager and Sneller's direct supervisor; Ken Bay; and another
supervisor about the differences in scheduling needs for the
sterile filling area on the weekends compared to during the week.
(Baxter St. Undisp. Mat. Facts ¶ 23; Pl. Resp. ¶ 23.)  They
agreed that while the Cherry Hill facility operates approximately
three filling rooms on the weekdays, it operates only one filling
room on the weekends, with more limited staffing and a greater
need for flexibility.  (Baxter St. Undisp. Mat. Facts ¶ 23; Pl.
Resp. ¶ 23.)  Consequently, Baker implemented a new policy, which
applied to everyone, that selected individuals for overtime work
on Saturday from a list of volunteers in the order of those most
qualified to perform all the requirements of the job, including
cleaning the air lock.  (Baxter St. Undisp. Mat. Facts ¶ 23; Pl.
Resp. ¶ 23.)  Pursuant to this policy, Plaintiff was not assigned
any overtime, even though she volunteered for it.

     In April 2006, Plaintiff approached Sneller about being
considered for overtime schedule on Saturdays.  (Baxter St.
Undisp. Mat. Facts ¶ 24; Pl. Resp. ¶ 24.)  Sneller advised her
that, in accordance with Baxter's policy, Plaintiff was not
qualified to work overtime on the weekends because she could not
perform the air lock cleaning function.  (Baxter St. Undisp. Mat.
Facts ¶ 24; Pl. Resp. ¶ 24.)  Plaintiff was surprised by this
change because she had always been able to work overtime on

13

weekends in the past.  (Pl. St. Undisp. Mat. Facts ¶ 19; Baxter
Resp. ¶ 19.)

James Sneller then asked Fran Wadler, Baxter's Senior
Occupational Nurse, to review Plaintiff's file and determine if
there was anything indicating that she was unable to perform a
specific task.  (Pl. St. Undisp. Mat. Facts ¶ 20; Baxter Resp. ¶
20.)  Nurse Wadler found the 2003 incident report with a one-week
limitation on exposure to bleach by the physician, but nothing
indicating that Plaintiff was unable to perform her job for any
extended period of time.  (Pl. St. Undisp. Mat. Facts ¶ 20;
Baxter Resp. ¶ 20.)  Baxter told Plaintiff that if she wished to
continue the restriction of her duties, she needed medical
documentation.  (Baxter St. Undisp. Mat. Facts ¶ 29; Pl. Resp. ¶
29.)

       4.  <u>Medical Evidence Provided to Baxter</u>

On or about April 24, 2006, Ms. Olivera asked Dr. Gitler to
write her a note to give to Baxter.  That note, on the letterhead
of Dr. Gitler's medical practice, states as follows:

> Dear Ms. Wadler:
>
>   Jacqueline Olivera has requested that I
> write a note because she suffers from asthma.
> She feels that she is not able to work with
> cleaning/sanitizing chemical solutions because
> exposure to the fumes can trigger her asthma.
> Please accommodate her accordingly.  Thank
> you.

14

(Letter from Dr. Gitler to Nurse Wadler, Apr. 24, 2006, Ex. K to White Cert.)

Patricia Bohn, Baxter's Human Resources Manager, requested that Nurse Wadler contact Dr. Gitler to discuss this matter further. (Pl. St. Undisp. Mat. Facts ¶ 22; Baxter Resp. ¶ 22.) On April 26, 2006, Wadler called Dr. Gitler's office and spoke to his billing clerk who stated that Plaintiff had been a patient of Dr. Gitler's since 2004. (Pl. St. Undisp. Mat. Facts ¶ 22; Baxter Resp. ¶ 22.) Although the clerk told Wadler Plaintiff suffered from asthma, she also reported that Plaintiff had not needed to use her medications for a long time and that Dr. Gitler never needed to treat her for this condition. (Pl. St. Undisp. Mat. Facts ¶ 22; Baxter Resp. ¶ 22.) Therefore, it appears that Dr. Gitler's understanding of Plaintiff's condition came from her reports of her history. Following this conversation, Wadler told Plaintiff that Baxter needed additional information. (Pl. St. Undisp. Mat. Facts ¶ 23; Baxter Resp. ¶ 23.) Apparently Dr. Gitler spoke with Plaintiff again and obtained a more detailed medical history and Plaintiff told Dr. Gitler that she continued to work as a filling operator after the 2003 incident. (Pl. St. Undisp. Mat. Facts ¶ 23; Baxter Resp. ¶ 23.) Dr. Gitler wrote a second note to Baxter on May 1, 2006, which stated:

Dear Ms. Wadler:

I had the opportunity to speak with

15

> Jacqueline Olivera after my earlier letter and
> she provided additional history information of
> which I was previously unaware.  She reports
> that on two occasions in the past (2003), she
> experienced reactions to bleach cleaning
> solutions that necessitated emergency room
> treatment.  She relates that her face and lips
> swelled and she experienced difficulty
> breathing.  As a result, she has avoided
> contact with those solutions since that time.
> I think it would be prudent for her to
> continue that avoidance.  I think that her
> employment should not include exposure to such
> bleach solutions.  Please accommodate her
> accordingly.  Thank you.

(Letter from Dr. Gitler to Nurse Wadler, May 1, 2006, Ex. L to White Cert.)  Baxter has submitted evidence indicating that "exposure" was a term of art in the environmental health field and that some employees at Baxter thought the doctor was requesting that she avoid working in rooms where bleach was used. (McDevitt Dep. at 19:17-20, Ex. P to White Cert.)

On May 2, 2006,[8] Nurse Wadler called Dr. Gitler to obtain further clarification.  (Baxter St. Undisp. Mat. Facts ¶ 37; Pl. Resp. ¶ 37.)  There is a dispute of fact as to what Dr. Gitler said during that conversation.  Baxter claims that Dr. Gitler told Wadler that Plaintiff's medical restriction was permanent and that she should not be exposed to bleach in any form. (Baxter St. Undisp. Mat. Facts ¶ 37.)  Plaintiff claims that Dr.

---

[8]  Dr. Gitler testified that he thought the phone call on or about May 2, 2006 occurred before he wrote the note, which is dated May 1, 2006.  (Gitler Dep. at 85:15-18.)  The chronology of the communications is not material to these motions.

16

Gitler told Wadler that he needed to take Plaintiff's history regarding her reaction to bleach products and that he considers this to be a permanent problem.  (Pl. Resp. ¶ 37.)  Baxter's Nurse Wadler testified that Dr. Gitler advised in this conversation that Plaintiff should not be exposed to bleach in any form.  (Wadler Dep. at 43:1-4, Ex. R to White Cert.)  However, Nurse Wadler also testified that she believed it was Dr. Gitler's opinion that "it would be prudent for [Plaintiff] to continue what she was doing" and "avoid[] contact with those solutions in her work situation."  (Id. at 45:16-23.)

     5.   <u>Baxter Removes Plaintiff From Filling Operator Position and Procures Additional Information from Dr. Gitler</u>

On May 8, 2006, a group of Baxter employees – Bohn, Wadler, Overbeck and Sneller – met to discuss Plaintiff's medical restriction and employment.  (Baxter St. Undisp. Mat. Facts ¶ 40; Pl. Resp. ¶ 40.)  As a result of this conversation, Baxter removed Plaintiff from the filling operator position and transferred her, temporarily, to the Inspection/Packaging area at the same rate of pay.  (Baxter St. Undisp. Mat. Facts ¶ 41; Pl. Resp. ¶ 41.)  Also as a result of this conversation, Baxter sought out additional information about Plaintiff's medical condition.

Bohn spoke with Plaintiff and told her that if Baxter could not accommodate her asthma in the filling operator position,

17

Baxter would try to find another position for her at Baxter. (Baxter St. Undisp. Mat. Facts ¶ 42.)  Bohn also asked if Plaintiff had any additional recommendations for an accommodation that would allow Plaintiff to remain in the filling operator position.  (Id. at ¶ 43.)  Plaintiff suggested the use of a mask. (Id. at ¶ 44.)  Baxter has submitted evidence indicating that it investigated whether use of a mask was feasible and determined that there was none that would be suitable for the sterile cleaning environment.  (Id. at ¶¶ 45-50.)  Plaintiff points to evidence that indicates Baxter did not fully consider the mask option and argues that, in any event, Defendant should have known a mask was not necessary because Plaintiff had never experienced any problems except when she was cleaning the air lock.  (Pl. Resp. ¶¶ 43-46, 52-53.)  However, Plaintiff does not come forward with any evidence that there were masks or respirators available that she could have used in a sterile environment.

Plaintiff asked Bohn whether she could appeal the decision to transfer her from the filling operator position.  (Baxter St. Undisp. Mat. Facts ¶ 52.)  Bohn directed Plaintiff to speak with Tom McDevitt, the Director of Manufacturing.  (Id.)  Plaintiff explained to McDevitt that she felt she was being punished and McDevitt insisted that there was no punishment, just that the company was trying to avoid any "exposure" to bleach, as her doctor had indicated.  (McDevitt Dep. at 16, Ex. P to White

18

Cert.)  McDevitt testified that he could not think of
accommodations that would permit Plaintiff to remain as a filling
operator but also avoid all exposure to bleach.  (<u>Id.</u> at 17-19.)
Accordingly, he told her that she could not be accommodated as a
filling operator based on her doctor's recommendation that she
not be exposed to bleach.  (<u>Id.</u> at 16:10-16.)  The evidence
suggests that by May 18, 2006, Baxter determined that it would
remove Plaintiff permanently from the filling operator position
and transfer her to a position at a lower pay rate.  (Baxter
Memo, May 18, 2006, at 84, Ex. L to Hildebrand Cert.)

On May 31, 2006, Bohn met with Plaintiff to discuss her
permanent reassignment away from the filling operator position.
(Bohn Memo, May 31, 2006, at 85, Ex. L to Hildebrand Cert.)[9]
Because Plaintiff was dissatisfied and concerned that Baxter
appeared to be mischaracterizing Dr. Gitler's recommendations,
Bohn agreed to arrange a conference call between Bohn, Plaintiff,
Gitler and Nurse Wadler.  (Baxter St. Undisp. Mat. Facts ¶ 55;
Pl. Resp. ¶¶ 55, 56.)  Plaintiff explained her job duties to Dr.
Gitler on that call, because she felt he did not understand them.
(Olivera 2Dep. at 25-26.)  Viewing the evidence in Defendant's

---

[9]  This memo also indicates, somewhat contradictorily to
other evidence in the case, that Baxter offered Plaintiff another
position that had recently become available that had the same
shift, same hours, and same hourly rate as her filling operator
position, but would require no contact with bleach solutions, and
that Plaintiff rejected that position.  (Bohn Memo, May 31, 2006,
at 85, Ex. L to Hildebrand Cert.)

favor, Dr. Gitler was asked to explain what he meant when he advised that Plaintiff's employment should not include exposure to bleach solutions and Dr. Gitler replied that she should avoid contact with bleach solutions in any form.  (Baxter St. Undisp. Mat. Facts ¶¶ 60, 62.)  Viewing the evidence in Plaintiff's favor, Gitler said nothing more than that Plaintiff's abstention from cleaning was necessary and sufficient to prevent her from suffering an asthma attack at work, as it had been in the past.

Plaintiff testified that her doctor could not say whether she should be removed from the position and that she "shouldn't have contact, direct contact with the Clorox."  (Olivera 2Dep. at 26:7-24.)

> Q:  Was [Bohn] asking Dr. Gitler what he meant by no exposure to bleach?
> A:  Yes.  And he told her he was referring not to be in contact with the chemical.
> Q:  Did they talk at all about your ability to breathe it, to breathe bleach?
> A:  I think so.  I think they talked about it.
> Q:  And what did Dr. Gitler say about your breathing bleach fumes?
> A:  What he said was that they should try to accommodate me because the fumes of the bleach would affect me or my asthma condition.  That's why he asked them to accommodate me and that I shouldn't have contact with the chemical.
> Q:  Did he say you shouldn't have any contact with it?
> A:  Especially with the bleach.
> Q:  No contact of any kind, correct?
> A:  Because it affects me.  That's why I got those reactions.  That has given me very bad reactions.

(Olivera 1Dep. at 155:10 to 156:12.)  Bohn testified that she did
not challenge Dr. Gitler about the accuracy of his medical
opinion regarding Plaintiff's exposure to bleach because he was
Plaintiff's physician and Plaintiff was the one who had provided
Baxter with the notes from Dr. Gitler.  (Bohn Dep. at 37:21 to
40:6.)  Bohn conceded, nevertheless, that there were questions in
her mind whether the advice was accurate, given that Plaintiff
had been successfully performing her job as a filling operator
for several years without any problems.  (Id. at 39:15-21.)  Dr.
Gitler testified that at this conference call he was referring to
specific tasks, but opined: "If there were other tasks that gave
her direct exposure, like standing next to the person spraying
[the cleaning solution], I would say that she shouldn't do those
either."  (Gitler Dep. at 164:12-17.)

     Baxter decided to remove Plaintiff from the filling operator
position and to provide her with the opportunity to bid for
another position in accordance with Baxter's seniority policy.
(Baxter St. Undisp. Mat. Facts ¶¶ 78-80; Pl. Resp. ¶¶ 78-80.)
Baxter transferred Plaintiff to the position of a machine
operator, which reduced Plaintiff's hourly rate of pay.  (Baxter
St. Undisp. Mat. Facts ¶¶ 78-80; Pl. Resp. ¶¶ 78-80.)

     **D.   Deposition Testimony and After-Acquired Evidence
          Regarding Plaintiff's Medical Condition**

     At his deposition, Dr. Gitler testified that he believed
that future exposure to bleach could cause Plaintiff to have a

more severe reaction and therefore recommended that Plaintiff
avoid exposure to bleach.  (Gitler Dep. at 84:13-21.)  Dr. Gitler
further testified that it is impossible to predict with medical
certainty the severity of a patient's next reaction.  (Id. at
27:15-21.)  Dr. Gitler testified that he never told Baxter that
exposure to bleach would be acceptable so long as Plaintiff was
not performing the air lock function; rather he told Plaintiff,
and Baxter, that Plaintiff should avoid contact with cleaning
solutions entirely.  (Id. at 136:2-3, 9-20.)

On the other hand, Dr. Gitler also testified that it was his
opinion that Baxter should have continued to accommodate
Plaintiff as she had been in the past and "should not be doing
those particular tasks" that had caused her earlier reactions.
(Id. at 111:17-19.)  Dr. Gitler testified that "when she was
directly the one involved using the solution is when she had
reactions and the rest of the time she had no history of
reactions."  (Id. at 152:20-23.)  Dr. Gitler's notes indicate
that his opinion was that Plaintiff,

> cannot have direct contact with the bleach
> cleaning solution as that is what has caused
> her previous reactions.  If her job can be
> modified so she is not responsible for that
> task, I feel she can resume the other duties
> of her prior position as filling operator.

(Id. at 162:5-12.)  When asked at his deposition, Dr. Gitler
defined "direct contact" as "her being the one spraying the

22

solution, and certainly, when you use a spray bottle, some of it is going to float back at you unless you're wearing some type of protective gear." (Id. at 162:22 to 163:3.) Dr. Gitler described "indirect contact" as "being somewhere where a bleach solution or [f]antasti[k®] had previously been used but wasn't actively being sprayed at the time she was in that room or that space." (Id. at 163:7-11.) Dr. Gitler testified ambiguously about whether he made that distinction in his conversations with Baxter. (Id. at 163:12-20.) Further, he testified that "If there were other tasks that gave her direct exposure, like standing next to the person spraying it, I would say that she shouldn't do those either." (Id. at 164:12-17.) However, Dr. Gitler did not indicate there was any problem with Plaintiff passing through areas that had recently been cleaned "from ceiling to floor" with bleach. "Based on her history, I had no reason to think that that posed a risk." (Id. at 165:5-7.)

Importantly, Dr. Gitler testified that he had not been informed about all of the details of Plaintiff's job or the use of bleach in the environment, other than the air lock cleaning function. (Id. at 115.) For example, Dr. Gitler seemed unaware of the sterile nature of the filling room and recommended that Plaintiff avoid contact with bleach entirely, wear a mask, gloves, and use "proper ventilation." (Id. at 136:1-8.)

Subsequent to Plaintiff's transfer, she suffered asthma

23

symptoms in May and July of 2006 related to incidents at home and
her use of cleaning agents.  (Baxter St. Undisp. Mat. Facts ¶¶
82-83; Pl. Resp.  ¶¶ 82-83.)  Thereafter, an allergy and asthma
specialist, Dr. Graziano, prescribed Plaintiff with Advair, an
EpiPen, and Benadryl.  (Baxter St. Undisp. Mat. Facts ¶ 84; Pl.
Resp. ¶ 84.)  Also subsequent to these incidents, Dr. Gitler
advised Plaintiff to avoid contact with cleaning solutions
entirely, if at all possible, and to use gloves, a mask and
proper ventilation.  Dr. Gitler made this recommendation because
the July incident was the third documented reaction Plaintiff had
to using cleaning solutions, and he did not think it was
advisable for Plaintiff to continue using them.  (Baxter St.
Undisp. Mat. Facts ¶ 88; Pl. Resp. ¶ 88.)  On October 10, 2006,
Plaintiff told Dr. Gitler that she had again experienced a
reaction to a home cleaning spray a few weeks prior.  (Baxter St.
Undisp. Mat. Facts ¶ 89; Pl. Resp. ¶ 89.)  Dr. Gitler did not
provide subsequent communication to Baxter about Plaintiff's
medical needs.  (Baxter St. Undisp. Mat. Facts ¶ 93; Pl. Resp. ¶
93.)

## III. DISCUSSION

### A.   Standard

Summary judgment is appropriate when the materials of record
"show that there is no genuine issue of material fact and that
the moving party is entitled to judgment as a matter of law."

24

Fed. R. Civ. P. 56(c).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  <u>Id.</u> In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "[t]he nonmoving party's evidence 'is to be believed, and all justified inferences are to be drawn in [that party's] favor.'"  <u>Hunt v. Cromartie</u>, 526 U.S. 541, 552 (1999) (quoting <u>Liberty Lobby</u>, 477 U.S. at 255).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved in favor of either party."  <u>Liberty Lobby</u>, 477 U.S. at 250; <u>Brewer v. Quaker State Oil Refining Corp.</u>, 72 F.3d 326, 329-30 (3d Cir. 1995)(citations omitted).  The moving party always bears the initial burden of showing that no genuine issue of material fact exists, regardless of which party ultimately would have the burden of persuasion at trial.  <u>See</u> <u>Celotex Corp.</u>, 477 U.S. at 323.  However, the non-moving party "may not rest upon the mere allegations or denials of" its pleading to show the existence of a genuine issue.  Fed. R. Civ. P. 56(e).

The standard by which the court decides a summary judgment motion does not change when the parties file cross-motions.

25

<u>Weissman v. United State Postal Serv.</u>, 19 F. Supp. 2d 254 (D.N.J.
1998).  When ruling on cross-motions for summary judgment, the
court must consider the motions independently, <u>Williams v.
Philadelphia House Auth.</u>, 834 F. Supp. 794, 797 (E.D. Pa. 1993),
<u>aff'd</u>, 27 F.3d 560 (3d Cir. 1994), and view the evidence on each
motion in the light most favorable to the party opposing the
motion.  <u>See</u> <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio
Corp.</u>, 475 U.S. 574, 587 (1986).

   **B.   NJLAD Requirements and Exceptions**

      For purposes of these motions, Baxter concedes that
Plaintiff is an individual with a disability within the meaning
of the New Jersey Law Against Discrimination ("NJLAD").
Accordingly, Baxter was required to accommodate Plaintiff unless
Baxter can show that Baxter reasonably concluded that Plaintiff's
disability presented a materially enhanced risk of substantial
harm to herself in the workplace.  Although Plaintiff is
requesting an exemption from the cleaning functions, Baxter is
not arguing that this is an essential job function, nor could it
– Baxter's own evidence indicates that the cleaning function was
secondary and there is no evidence to the contrary.  It is
equally clear from the evidence, however, that it was essential
that the environment be sterile, that is cleaned with a solution
containing bleach several times each day, and that no employee's
medications, even rescue inhalers, were permitted in the filling

rooms.  Thus, the issue is whether Baxter reasonably concluded that Plaintiff's asthma presented a materially enhanced risk of substantial harm in the workplace, even with Plaintiff's exemption from the cleaning function.  Several provisions of New Jersey's antidiscrimination law are the sources of this framework, which shall be explicated below.

First, the NJLAD generally prohibits discrimination in employment on account of disability.  That requirement has its source in at least three provisions of law.

> All persons shall have the opportunity to obtain employment . . . without discrimination because of . . . disability . . . subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right.

N.J. Stat. Ann. § 10:5-4.

Second, the NJLAD prohibits "any unlawful discrimination against any person because such person is or has been at any time disabled or any unlawful employment practice against such person, unless the nature and extent of the disability reasonably precludes the performance of the particular employment."  N.J. Stat. Ann. § 10:5-4.1.  Pursuant to that provision, the law prohibits disability discrimination in employment unless the individual's disability "reasonably precludes" the employment at issue.

The third provision shifts the burden for showing that

27

preclusion to the employer:

> Unless it can be clearly shown that a person's disability would prevent such person from performing a particular job, it is an unlawful employment practice to deny to an otherwise qualified person with a disability the opportunity to obtain or maintain employment, or to advance in position in his job, solely because such person is a person with a disability or because such person is accompanied by a service or guide dog.

N.J. Stat. Ann. § 10:5-29.1.[10]

---

[10]   As the New Jersey Supreme Court has explained the burden of proof in disability discrimination employment cases,

> (1) the complainant shall have the burden of proof as to whether the complainant was physically handicapped under the statute; (2) the complainant shall have the burden of proof as to whether the complainant was qualified for the job; (3) the complainant shall have the burden of proof to show that the complainant was denied the job because of his physical condition, and (4) the respondent shall have the burden of coming forth with evidence as to whether the complainant's physical condition reasonably precluded him from the particular employment.

> [W]here it is obvious to the parties . . . that physical qualifications are in issue, complainant should have the initial burden of proving that he or she was in fact qualified for the job in terms of the general qualifications and in terms of the physical qualifications. Only when those first two hurdles have been surpassed will the burden shift to the employer to demonstrate the affirmative defense that it reasonably arrived at the opinion that the worker's handicap precluded performance of the job.

As a corollary, the NJLAD does not preclude employers from taking adverse employment actions against disabled individuals who are not able to perform the essential functions of their jobs:

> Nothing contained in this act . . . shall be construed . . . to prohibit the establishment and maintenance of bona fide occupational qualifications . . . nor to prevent the termination or change of the employment of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment, nor to preclude discrimination among individuals on the basis of competence, performance, conduct or any other reasonable standards . . . .

N.J. Stat. Ann. § 10:5-2.1.

> [T]he protection afforded an employer by N.J.S.A. 10:5-4.1 is no greater than that afforded by N.J.S.A. 10:5-2.1. Under both enactments, an employer found to have reasonably arrived at an opinion that a job applicant cannot do the job, either because the applicant is unqualified or because of a given handicap, cannot be found liable for discrimination against that applicant.

Andersen v. Exxon Co., U.S.A., 89 N.J. 483, 497 (1982).

However, because there is no evidence or argument that the cleaning function is an essential one, the Court may presume on this motion that it is not.[11]  On the other hand, there is also

---

Andersen v. Exxon Co., U.S.A., 89 N.J. 483, 499-500 (1982).

[11]  Cf. Raspa v. Office of Sheriff of County of Gloucester, 191 N.J. 323, 338 (2007).  In Raspa, there was no dispute that

no dispute that the sterility of the environment is essential to the job, and thus, that in performing her essential job function of filling medications, Plaintiff would be in proximity to areas where others are using the cleaning solution.  See Pl. Opp. Br. at 33 ("Because of the need for sanitization, bleach is a natural part of her working environment.  In fact, she can't avoid it.").

The New Jersey Supreme Court has explained that if an employee is unable to perform essential functions of the job, the NJLAD affords no protection.  Raspa v. Office of Sheriff of County of Gloucester, 191 N.J. 323, 327 (2007) ("an employee must possess the bona fide occupational qualifications for the job position that employee seeks to occupy in order to trigger an employer's obligation to reasonably accommodate the employee to the extent required by the LAD").  The implementing regulations are in accord:

> (a)  It shall be lawful to take any action otherwise prohibited under this section where it can reasonably be determined that an

---

the plaintiff's disability precluded his interactions with inmates and that interaction with inmates was an essential function of his job as it existed prior to his request for an accommodation.  Accordingly, the court was able to determine as a matter of law that the disability precluded the plaintiff from performing the particular job at issue, thus removing him from the LAD's protection.  Id. at 327 ("This appeal requires that we address the threshold question of whether, as a matter of law, an employee can prosecute a claim alleging that his employer failed to accommodate the employee's disability in violation of the Law Against Discrimination, N.J.S.A. 10:5-1 to -49 (LAD), when the employee's permanent disability renders him unable to discharge essential functions of the position in which he was employed.").

30

applicant or employee, as a result of the individual's disability, cannot perform the essential functions of the job even with reasonable accommodation.

[. . .]

2. Refusal to select a person with a disability may be lawful where it can be demonstrated that the employment of that individual in a particular position would be hazardous to the safety or health of such individual, other employees, clients or customers. Such a decision must be based upon an objective standard supported by factual or scientifically validated evidence, rather than on the basis of general assumptions that a particular disability would create a hazard to the safety or health of such individual, other employees, clients or customers. A "hazard" to the person with a disability is a materially enhanced risk of serious harm.

3. The burden of proof is upon the employer . . . to demonstrate in each case that the exception relied upon is based upon an objective standard supported by factual evidence . . . .

N.J. Admin. Code § 13:13-2.8.  See also 38 N.J. Reg. 335(a) (Jan. 3, 2006) ("an individual with a disability need only show that he or she can perform the essential functions of a job" to make out a prima facie case of disability discrimination under the NJLAD, not that the individual was able to perform all job functions).

Thus, an employer can remove a person with a disability from a position in which his or her disability poses a materially enhanced risk of serious harm to the employee, as determined by reference to specific evidence rather than general assumptions

31

about the nature of the employee's impairment.

> If . . . the employer defends by asserting
> that it reasonably concluded that the handicap
> prevented the employee from working, the
> burden of proof -- as distinguished from the
> burden of production -- shifts to the employer
> to prove that it reasonably concluded that the
> employee's handicap precluded performance of
> the job. When asserting the safety defense,
> the employer must establish with a reasonable
> degree of certainty that it reasonably arrived
> at the opinion that the employee's handicap
> presented a materially enhanced risk of
> substantial harm in the workplace.

Jansen v. Food Circus Supermarkets, Inc., 110 N.J. 363, 383

(1988).  When an employer asserts the safety defense, it may

eventually have to prove to the jury that it reasonably arrived

at its opinion after reviewing objective medical evidence.  The

employer need not prove that its opinion was correct, just that

it was reasonable.

     As the New Jersey Supreme Court explained in a case

involving an employee with epilepsy, the information the employer

relies on must be specific to the particular employee, not merely

to the disability:

> In deciding whether the nature and extent of
> an employee's handicap reasonably precludes
> job performance, an employer may consider
> whether the handicapped person can do his or
> her work without posing a serious threat of
> injury to the health and safety of himself or
> herself or other employees. That decision
> requires the employer to conclude with a
> reasonable degree of certainty that the
> handicap will probably cause such an injury.

32

> The mere fact that the applicant is an epileptic will not suffice. Otherwise, unfounded fears or prejudice about epilepsy could bar epileptics from the work force.
>
> The appropriate test is not whether the employee suffers from epilepsy or whether he or she may experience a seizure on the job, but whether the continued employment of the employee in his or her present position poses a reasonable probability of substantial harm.

Id. at 374-75 (citation omitted).

Pursuant to employers' nondiscrimination obligations, they must provide reasonable accommodations to qualified individuals with disabilities, that is, employees who can perform essential job functions without posing serious threats of injury to themselves or others.[12]

**C.   Analysis**

1.   Plaintiff's Motion for Summary Judgment

On this motion, there is no dispute that Plaintiff is an individual with a disability covered by the NJLAD and that Baxter removed her from her job because Baxter determined that Plaintiff's continued employment as a filling operator, even with an accommodation, was hazardous to her health and safety.  On

---

[12]   There is an exception if the employer shows that accommodating the employee would constitute a hardship.  See N.J. Admin. Code § 13:13-2.5 (listing accommodation obligation and possible accommodations).  For purposes of these motions, Baxter makes no argument that accommodating Plaintiff's disability would create an undue hardship, and concedes that it would not, at least as to the weekdays.

Plaintiff's motion, the Court views the evidence in the light most favorable to Baxter.  Because a reasonable jury could determine to a reasonable degree of certainty that Baxter relied on medically reliable evidence to decide that Plaintiff's asthma presented a materially enhanced risk of substantial harm to her in the workplace, the Court cannot grant summary judgment to Plaintiff.

Baxter has come forward with evidence that shows Plaintiff would be continually exposed to a cleaning solution containing bleach so long as she worked as a filling operator, even if she did not personally perform the air lock cleaning function.  It is undisputed that the area in which Plaintiff was working was cleaned with the bleach solution approximately three times per day and that Plaintiff walked through the air lock several times per day, thus bringing her in close proximity to people performing the cleaning function that had triggered her asthma attacks in the past.

It is also undisputed that Plaintiff has asthma and that her doctor advised Baxter that bleach was a trigger for her asthma. Dr. Gitler advised Baxter to accommodate Plaintiff in a way that would prevent her exposure to bleach.  Plaintiff had suffered at least two asthma attacks at work in the past and had a rescue inhaler that she could not bring with her into the sterile filling room.  A reasonable jury could determine that Baxter

reasonably concluded that Plaintiff's continued employment in this environment made it likely that she would suffer another asthma attack.  Although in the past Plaintiff's asthma attacks had caused minor rather than significant harm, a jury could determine that it was reasonable for Baxter to determine, based on Dr. Gitler's recommendations, that Plaintiff could suffer another attack that would be significant, given her lack of ready access to emergency relief and the lack of ventilation in the sterile filling rooms.[13]

Although the safety defense asserted by Baxter in this case is an affirmative one, the burden is on Plaintiff on its motion for partial summary judgment to show that no jury could find in Baxter's favor.  See Celotex Corp., 477 U.S. at 323 (party seeking summary judgment always has initial burden of showing it is entitled to judgment as matter of law); Jansen, 110 N.J. at 383 (burden of proof is on employer who admits to firing plaintiff because of disability to show that plaintiff cannot

_____

[13]  In addition, although the law may have required Baxter to accommodate Plaintiff, this Court cannot say on the record before it that Baxter's decision to transfer her to another position was unlawful.  See Tynan v. Vicinage 13 of Superior Court, 351 N.J. Super. 385, 403 (App. Div. 2002) (noting that transfers to other positions, even ones that may be considered demotions, may be reasonable accommodations, depending on the circumstances); Jones v. Aluminum Shapes, 339 N.J. Super. 412, 427 (App. Div. 2001) ("There is no precedent for the proposition that, if a disabled employee must be demoted in order to accommodate his or her disability, then the job description must be changed to reflect the level of benefits or compensation of the employee's original job.").

perform essential job functions or that employer reasonably
determined plaintiff's employment would be unsafe).  Because
Baxter has come forward with evidence from which a reasonable
jury could conclude that its decision to transfer Plaintiff from
the filling operator position was lawful, see, e.g., N.J. Admin.
Code § 13:13-2.8(a)(2) ("Refusal to select a person with a
disability may be lawful where it can be demonstrated that the
employment of that individual in a particular position would be
hazardous to the safety or health of such individual."), the
Court must deny Plaintiff's motion for summary judgment.

     2.   Baxter's Cross-motion for Summary Judgment

On the other hand, the Court must also deny Baxter's cross-
motion for summary judgment, because a reasonable jury could
find, when viewing the evidence in the light most favorable to
Plaintiff, that Baxter behaved unreasonably when it determined
that Plaintiff's safety was at risk in the filling operator
position.

Plaintiff has presented undisputed evidence that Plaintiff
performed her job without incident for three years because she
avoided performing the air lock cleaning function, which is the
accommodation she requested.  Although Baxter solicited advice
from Dr. Gitler about the level of exposure to bleach Plaintiff
could tolerate, there is evidence that Baxter failed to inform
Gitler about the functions and conditions of Plaintiff's

employment.  "An employer may not rely on a deficient report to
support its decision to fire a handicapped worker." <u>Jansen</u>, 110
N.J. at 379.

Furthermore, a reasonable jury could find that Dr. Gitler's
advice was only that Plaintiff's accommodation continue in place
and that Baxter unreasonably twisted his recommendation in order
to justify Plaintiff's transfer from her position.  Plaintiff
continually asserted to Baxter that she would be fine so long as
she avoided the cleaning function, and her work history supported
that assertion.  In deciding whether safety concerns preclude a
disabled employee from performing her job, "the employer should
review . . . relevant records such as the employee's work and
medical histories." <u>Jansen</u>, 110 N.J. at 379.  In addition, there
is no evidence that the cleaning function was an essential
function of the position.

The safety defense is an affirmative one that requires
Baxter to prove to a jury that it came to its decision about the
risk to Plaintiff using an "objective standard supported by
factual or scientifically validated evidence, rather than on the
basis of general assumptions that a particular disability would
create a hazard" to Plaintiff's safety or health.  N.J. Admin.
Code § 13:13-2.8(a)(2).  Evidence that Plaintiff's continued
employment as a filling operator might possibly cause another
asthma attack is not sufficient.  <u>See</u> <u>Jansen</u>, 110 N.J. at 374-75

("The appropriate test is not whether the employee suffers from epilepsy or whether he or she may experience a seizure on the job, but whether the continued employment of the employee in his or her present position poses a reasonable probability of substantial harm.").[14]  "[U]nder the safety defense, an employer's decision not to employ a handicapped person must be justified by a 'probability' rather than a 'possibility' of injury to the handicapped person or others."  Id. at 376.

> The employer may not assume that harm will result, nor may it act on the fears and prejudices of other employees. When relying upon a safety defense, an employer must make "an individualized assessment of the safety risk," which must include objective medical evidence as well as "relevant records such as the employee's work and medical histories." Jansen, supra, 110 N.J. at 379, 541 A.2d 682.

Barbera v. Di Martino, 305 N.J. Super. 617, 632 n.5 (App. Div. 1997) (citations omitted).

A reasonable jury could find that in this case there was only the possibility that Plaintiff might suffer another asthma attack that would cause her minor eye irritation and momentary

---

[14]  However, the Court takes note of evidence in the record, from Dr. Gitler, that indicates there is no objective test available for diagnosing asthma or predicting the likely severity of a future attack.  Rather, Dr. Gitler testified, an appropriate medical diagnosis is obtained by referring to the patient's history. (Gitler Dep. at 25:21 to 38:11, 100:7 to 105:1, Ex. T to White Cert.)  At trial, a jury will have to determine whether, in light of all the evidence, Baxter's decision was reasonable.

difficulties breathing and that such possibility only existed if Plaintiff was required to perform the non-essential cleaning functions.[15]  Such a jury determination would be reasonable as it is consistent with the evidence of Plaintiff's history, including her past asthma attacks at work and her three years of working without any incident.  In other words, a jury could find that, in light of Plaintiff's three-year history and the limited medical evidence Baxter obtained, that Baxter was unreasonable in making any determination either that another attack was probable or that such an attack, if it occurred, would likely cause substantial harm.  See Jansen, 110 N.J. at 377 ("The failure to distinguish between the risk of a future seizure and that of future injury is crucial. The assumption that every epileptic who suffers a seizure is a danger to himself or to others reflects the prejudice that the Law seeks to prevent.").  Viewing the facts in Plaintiff's favor, the Court must deny Defendant's motion for summary judgment.

---

[15]  Dr. Gitler testified that, in general, "An asthma attack can range in severity from just very mild irritative symptoms, cough, a little bit of difficulty breathing [to] very severe bronchiospasms where the breathing tubes are really narrowed down to where they're unable to adequately breathe and adequately get oxygen to the body, which can be life-threatening."  (Gitler Dep. at 22:21 to 23:5.)

**IV.   CONCLUSION**

For the foregoing reasons, the Court shall deny the cross

motions for summary judgment.


<u>June 27, 2008</u>                                      <u>s / Jerome B. Simandle</u>
Date                                                JEROME B. SIMANDLE
                                                    U.S. District Judge

40